___



SO ORDERED,

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: June 1, 2018**

The Order of the Court is set forth below. The docket reflects the date entered.
___

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE: NATIONAL TRUCK FUNDING LLC *et al.* | CASE NO. 17-51243-KMS |
| DEBTORS[1] | CHAPTER 11 |

### OPINION AND ORDER ON
### <u>CONFIRMATION OF CHAPTER 11 PLAN</u>

This matter came on for hearing on the Joint Chapter 11 Amended Plan of Reorganization of the Debtors (ECF No. 876) ("Plan")[2] and the Plan Supplement and Immaterial Modification to Joint Chapter 11 Amended Plan of Reorganization of the Debtors (ECF No. 1055) ("Plan Supplement") filed by Debtors, the Official Committee of Unsecured Creditors, and CAC Properties Inc. ("Plan Proponents"). This matter is within the bankruptcy court's core jurisdiction under 28 U.S.C. § 157(b)(2)(L) ("confirmations of plans").

Objections by the following parties were resolved either before or during the hearing:

- The United States Trustee (ECF No. 1025)

- John Fussell, as Trustee of the American Success Irrevocable Trust, Successful Living Irrevocable Trust and Falcon Capital LLC (ECF No. 1037)

___

[1] An order directing joint administration of the chapter 11 bankruptcy case of National Truck Funding, LLC, as lead case, with the chapter 11 bankruptcy case of affiliated debtor, American Truck Group, LLC, No. 17-51244-KMS, was entered on July 6, 2017. ECF No. 79.

[2] All capitalized words are terms defined either in the Opinion and Order, the Plan, or the Plan Supplement.

- Evabank (ECF No. 1039)

- Blue Cross & Blue Shield of Mississippi (ECF No. 1043)

At hearing, the parties agreed that the Release and Exculpation in Article XII, Section 12.3 of the Plan as amended by the Plan Supplement will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved. *See In re Miss. Phosphates Corp.*, No. 14-51667-KMS, ECF No. 1712, at 6 (Bankr. S.D. Miss. Oct 21, 2016) (recognizing binding authority of *Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009)).

Ruling from the bench on the "cram down" interest rate, the Court held that the Plan will pay secured claims at 6%, calculated as 1.25% over the current prime rate of 4.75%. *See Wells Fargo Bank N.A. v. Tex. Grand Prairie Hotel Realty, LLC (In re Texas Grand Prairie Hotel Realty, LLC)*, 710 F.3d 324, 337 (5th Cir. 2013) (approving "straightforward application" in case under chapter 11 of prime-plus approach in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)).

The remaining objections[3] made at the hearing each raise one or more of the following issues: materiality of the modification in the Plan Supplement, valuation of the parties' collateral, and the Plan's "dirt for debt" provisions. Based on the evidence, arguments, and applicable law, the objections are overruled. All other objections are deemed abandoned. The Plan, as amended by the Plan Supplement and modified at the hearing, is confirmed.

### I. The Debtors' Business

Debtors lease used semi-trucks, purchased on the wholesale market, to independent owner-operators through a weekly renewable rental program with an option to purchase. Operating out

---

[3] PACCAR Financial Corp. (ECF No. 1011); JB&B Capital LLC (ECF No. 1044); The Peoples Bank, Biloxi, Mississippi, Clarence Bruckner and June Allison McGown, The Entrust Group FBO Clarence Lee Bruckner IRA # 7230012782, and Charter Bank (ECF No. 1045); Warmimi Kanki Inc. (ECF No. 1047).

of Gulfport, Mississippi, Debtors have developed a national market, leasing trucks from a commercial fleet to individuals from more than thirty states. Revenue sources include rental fees, forfeited deposits, compliance and other fees, and vehicle sales to contracted renters and other customers. One Debtor partners with the renters on the operation, use, and repair of the trucks and constantly updates the fleet; the other Debtor generates revenue from vehicle repairs and sales, acting as a dealer for the sale of the fleet's inventory as it ages.

## II. The Objections

### A. The Modification in the Plan Supplement Is Immaterial.

PACCAR Financial Corp. asserts two arguments in opposition to the Plan Supplement. First, PACCAR argues that the Plan Supplement materially changes the terms of the Plan by moving twelve of its trucks from the operable ("keep") list to the inoperable ("return") list and moving four other trucks from the inoperable list to the operable list,[4] thereby changing the amounts of PACCAR's secured and unsecured claims; and by using "orderly liquidation value" instead of "replacement value" for the unsecured claims' initial value. Second, Paccar argues that the Plan Supplement was insufficiently noticed because it was filed the Friday before a long holiday weekend, with confirmation set for the following Tuesday. Both arguments fail.

The proponent of a chapter 11 plan may modify the plan "at any time before confirmation." 11 U.S.C. § 1127. The disclosure requirements under § 1125 apply to a modified plan only if the modification is material. *In re Art & Architecture Books of the 21st Century*, No. 2:13-bk-14135-RK, 2016 WL 1118743, at *5 (Bankr. C.D. Cal. Mar. 18, 2016).

---

[4] As described in more detail in Section C below, the Plan and Plan Supplement provide that trucks subject to security interests are separated into two classes based on whether the trucks are operable or inoperable. The Reorganized Debtors will keep the operable trucks. As to the inoperable trucks, the Reorganized Debtors will, at the option of the creditor, either return them to the creditor in exchange for a credit or will sell them, with the creditor receiving part of the proceeds. Plan Supplement, ECF No. 1055 at 6.

PACCAR has cited no case in which a plan modification was material as to a creditor that, like PACCAR, had voted to reject the plan. And the two cases PACCAR cited in support of this argument are, in fact, contrary authority. *See In re Frontier Airlines*, 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) ("If the modification adversely affects the interests of a creditor *who has previously accepted the plan*, in more than a purely ministerial de minimis manner, that creditor should have the opportunity to reconsider and change his or her vote." (emphasis added)); *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) ("Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties *who previously voted for the plan*." (emphasis added)). This view enjoys wide support. *See In re Art & Architecture Books*, 2016 WL 1118743, at *5 ("Numerous courts have held that further disclosure and re-solicitation of votes on a modified plan is only required when the modification materially and adversely affects parties who previously voted for the plan."). The modification is therefore immaterial.

As to notice, the only parties required to be noticed for a hearing on the materiality of a modification before confirmation are "the trustee, any committee appointed under the Code, and any other entity designated by the court." Fed. R. Bankr. P. 3019(a). Here, not only the required parties but also the objecting parties were present at the hearing. Notice is therefore a non-issue. *See Citicorp Acceptance Co. v. Ruti-Sweetwater (In re Sweetwater)*, 57 B.R. 354, 358 (D. Utah 1985) (notice received during hearings when modifications were proposed was "appropriate in the particular circumstances"); *In re Am. Solar King Corp.*, 90 B.R. at 823 (notice held sufficient, even though modification hearing was conducted along with the confirmation hearing, when all parties who objected to modification were present and represented by counsel); *see also* 11 U.S.C. § 102(1)(A) ("after such notice as is appropriate in the particular circumstances").

Further, it has been held, and this Court agrees, that a creditor that has voted to reject the plan lacks standing to object to the plan's modification. *See In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *13 (Bankr. D. Idaho Aug. 28, 2007). Like the creditor in *Simplot*, PACCAR has been "an active, informed participant" in the case. *Id.* at *12. Because additional disclosure about the modification would not have affected its vote, the creditor in *Simplot* was not aggrieved by the allegedly inadequate disclosure. *Id.* at *13; *see also KBC Bank, NV v. Capitol Lakes, Inc.*, Nos. 16-cv-266-wmc, 16-cv-468-wmc, 2016 WL 5394767, at *8 (W.D. Wis. Sept. 27, 2016) (bank that rejected previous plan lacked standing to challenge amended plan on basis that it was not disclosed). PACCAR similarly is not aggrieved.

Notwithstanding the modification's immateriality, the Plan Proponents have offered PACCAR a concession. In their post-hearing brief, they agree to remove six trucks from the return list and to also take into account a seventh truck that is the subject of an insurance dispute with PACCAR. According to the Plan Proponents, this concession would reduce the Plan Supplement's impact on PACCAR's claims, decreasing the net difference between the pre- and post-modification Plan to $60,000—a 2% change. The Court approves this concession.

### B. Replacement Value Is the Cost of Similar Trucks on the Wholesale Market.

The value of a secured claim is determined in light of "the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). In the context of confirmation, courts use § 506(a) to value collateral the debtor intends to keep under a cram-down plan. *See* 11 U.S.C. § 1129(b). "Under this cram-down provision, a bankruptcy court may confirm a plan over a creditor's objection subject to certain conditions, so long as the plan 'does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not

accepted, the plan.'" *Houston SportsNet Fin. LLC v. Houston Astros, LLC (In re Houston Reg'l Sports Network, LP*), 886 F.3d 523, 528 (5th Cir. 2018) (quoting 11 U.S.C. § 1129(b)(1)).

The standard under § 506(a) is replacement value. *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 956 (1997). When the debtor proposes to continue using the property in the debtor's business, the value of the property (and therefore the amount of the secured claim) is "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. The proper benchmark for replacement value "depend[s] on the type of debtor and the nature of the property." *Id.* at 965 n.6. Although *Rash* was decided in the context of chapter 13, its emphasis on "actual use" of the property as the guide to valuation also applies in chapter 11. *In re Houston Reg'l Sports Network*, 886 F.3d at 529.

Here, JB&B Capital LLC, Peoples Bank et al., and Warmimi Kanki LLC each object to Debtors' proposed valuation of the trucks securing their claims. Only Warmimi put on expert testimony.

Warmimi's expert is certified in machinery and equipment appraisal, but has no particular expertise in semi-trucks and only three years' experience, two of which were spent in an apprenticeship. On cross-examination, he testified that he had appeared as an expert witness half-a-dozen times, but never in bankruptcy court. He also said he had no specific knowledge about the semi-truck leasing business.

He testified that the trucks should be valued at fair market value, defined as what a willing buyer would pay a willing seller when neither is under any compulsion to buy or to sell and both have reasonable knowledge of the relevant facts about the property. He derived this value using the market data approach, in which he looked at other trucks of the same year, make, and model and what they sold for on the open market. He then selected a value between the comparables as

the replacement value for the trucks. He further testified that although he did not use the income approach to valuation, he did calculate the future financial benefit of rental income as a hypothetical.

The Plan Proponent's expert has been an appraiser for 35 years and has served for the past 20 years as the director of appraisal services for a company that performs appraisals of over-the-road equipment for national lenders, carriers, and lessors. He estimated that over the past ten years, he has performed $70-80 billion in appraisals. His curriculum vitae includes a list of law firms that have hired him as an expert witness and courts in which he has testified, including bankruptcy courts in ten jurisdictions. He appraised the Debtors' fleet in 2014 and again in 2017 and is familiar with how their business and others like it operate.

He testified that the trucks should be valued at 10% below orderly liquidation value (OLV). This value assumes the seller is under some time duress. Like Warmimi's expert, the Plan Proponent's expert used the market approach, but he then triangulated the values. He searched for both retail asking prices and auction sales, then adjusted downward from the retail prices and slightly upward from the auction sales to get the OLV, from which he then derived the replacement value.

The difference of opinion between Warmimi's expert and the Plan Proponent's expert boils down to retail value versus wholesale value. In arguing for retail value, Warmimi emphasizes that the standard under *Rash* is the price a willing buyer would pay to obtain like property from a *willing* seller, and a willing seller would expect more for its equipment than a seller under the duress implicit in OLV. But Warmimi fails to appreciate that the Debtors are not buying trucks at retail; the Debtors routinely buy at wholesale, which is even less than OLV. As the Plan

Proponent's expert recognized, the Debtors have to buy on the wholesale market, because buying retail would eat up their profit margin.

The Court finds the Plan Proponent's expert more credible because of his decades of experience, his specialization in over-the-road equipment, and his understanding of how the Debtors use the trucks. Accordingly, the Court accepts his opinion as to the replacement value.

### C.  Treatment of Secured Truck Claims is Fair and Equitable

The Plan has not been accepted by each class of claims or interests as required for plan confirmation under § 1129(a)(8), and the Plan Proponents are requesting that the Plan be confirmed under §1129(b).  Section 1129(b)(1) provides that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  A plan is fair and equitable if it provides, among other things, the "indubitable equivalent" of its secured claims. 11 U.S.C. § 1129(b)(2)(A)(iii).

#### 1. Plan Provisions

Secured truck claims are classified under Article III of the Plan in Classes 3A-3X – Operable Trucks and in Classes 4A-4Q – Inoperable Trucks.  ECF No. 876 at 20-22.  Treatment of the Class 3 and Class 4 secured truck claims is provided in Article IV of the Plan and the Plan Supplement.  *Id.* at 23-24; ECF No. 1055 at 6-7.

Under Section 4.3 of the Plan, a holder of an Allowed Class 3 Claim will receive payment in an amount equal to the Replacement Value of the Collateral with interest at 6% based on a 48-

month amortization and will also retain its lien and security interest in the collateral.[5] ECF No. 876 at 23. The Reorganized Debtors have the right to market and sell the collateral after the Effective Date. *Id.* at 24.

Under Section 4.4, holders of Allowed Class 4 Claims may elect to accept surrender of their collateral in exchange for a credit against the Allowed Class 4 Claim or may elect to allow the Reorganized Debtors to market and sell the collateral and remit 85% of the Net Sales Proceeds to the secured creditor. *Id.* The Plan Supplement adds a new provision to Section 4.4 relating to Class 7 General Unsecured claims possessed by a Class 4 creditor. ECF No. 1055 at 6-7. The Class 7 claim is to be reduced by an agreed credit amount or by the amount actually received in connection with the sale of trucks after surrender. *Id.*

### 2. PACCAR Proof of Claim and Objection to Plan[6]

PACCAR filed a proof of claim for $4,394,834.44. Claim No. 4-1. The claim is for 21 cross-collateralized contracts secured by purchase money security interests in 122 used trucks. *Id.* PACCAR's claim is treated in Class 1 (Administrative Expense Claim), Class 3 (Secured Truck Claims - Operable Trucks), Class 4 (Secured Truck Claims - Inoperable Trucks) and Class 7 (General Unsecured Creditors). ECF No. 1011 at 2-3. According to PACCAR, the Class 1 claim is $50,000, the Class 3 claim for 96 trucks is $2,587,050.00, the Class 4 claim for return of 26 units is $449,000.00 and the Class 7 unsecured claim is $1,358,784.44 to be paid pro rata with other unsecured creditors. *Id.* The Plan Supplement modified the Class 3 and 4 amounts by changing the designation of 14 trucks (12 of which are PACCAR's) from operable to inoperable and 5 trucks

---

[5] As noted previously, the Court found the Applicable Rate to be 6%.

[6] Although only PACCAR argued this point at the confirmation hearing, several creditors objected to the treatment of secured truck claims. This Court's ruling on fairness applies to all objecting creditors.

(4 of which are PACCAR's) from inoperable to operable.[7] According to Debtors' appraisal, PACCAR's collateral has a value of $3,036.050.00. ECF No. 1078 at 1.

Although PACCAR cited numerous grounds for its objection to the Plan (ECF No. 1011), the issue before the Court is PACCAR's objection to treatment of its secured claim in both Classes 3 and 4 with surrender of only a portion of its collateral through a partial "dirt-for-debt" Plan. *See Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346 (5th Cir. 1989) (allowing debtor to transfer real property ("dirt") in satisfaction of undersecured creditor's claim ("debt")). PACCAR asserts that under *Sandy Ridge*, the debtor may satisfy the indubitable equivalent test for determining whether a plan is fair and equitable by "conveying to the creditor the entirety of its collateral in satisfaction of its secured claim." ECF No. 1011 at 7-8. PACCAR argues that the "Debtors cannot confirm a Plan involving a surrender of less than all of PACCAR's collateral." *Id.* at 7. Several other creditors made the same objection.

The Plan Proponents assert that a partial "dirt for debt" plan is allowable under § 1129, citing *Sandy Ridge; Bate Land Co. LP v. Bate Land & Timber LLC (In re Bate Land & Timber LLC),* 877 F.3d 188 (4th Cir. 2017); and *In re DLH Master Land Holding, LLC*, No. 10-30561-HDH-11, 2011 WL 5883881 (N.D. Tex. Nov. 23, 2011). ECF No. 1053 at 4-5. The Plan Proponents further contend that treatment of the Class 3 claims is not based on a dirt for debt provision to satisfy the indubitable equivalent test under § 1129(b)(2)(A)(iii) but is based on the lien retention and deferred cash payments provision of §1129(b)(2)(A)(i). *Id.* at 5.

---

[7] PACCAR argued at the hearing that this reduced the value it was to be paid in the Plan by approximately $1 million. The Plan Proponents asserted the figure was approximately $246,000.00. The Yolo Group stated in its Supplemental Memorandum in Support of Confirmation that the Plan Proponents would be willing to reduce the difference in value between the keep list and the return list caused by the Plan Modification by removing some trucks from the return list, thereby reducing the difference to approximately $60,450.00. ECF No. 1077 at 4. As noted in Section A above, the Court approves this change.

3. Analysis under § 1129(b)(2)(A)

Fair and equitable treatment of secured claims includes the following:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

This section provides alternatives by the use of the disjunctive "or." The Bankruptcy Code expressly states that "or" is not exclusive. *See* 11 U.S.C. § 102(5). Legislative history explains that "if a party 'may do (a) or (b),' then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." H.R. Rep. No. 95–595, at 315 (1977) *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6272; S. Rep. No. 95–989, at 28 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5814. *See also In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 305 (3rd Cir. 2010) (noting that under §102(5) a party is not limited to mutually exclusive choice). "As alternatives, these provisions are not even exhaustive. The introduction to §1129(b)(2) states that the 'condition that a plan be fair and equitable *includes* the following requirements. . . .' (emphasis added). The Bankruptcy Code specifies that the term 'includes' 'is not limiting.' 11 U.S.C.

§102(3)." *Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.),* 584 F.3d 229, 245 (5th Cir. 2009).

The court in *In re Simons,* 113 B.R. 942 (Bankr. W.D. Tex. 1990), explained that alternatives under §1129(b)(2)(A) are not mutually exclusive:

> There is no indication in the statute or the legislative history that the alternative minimal conditions contained in 11 U.S.C. §§ 1129(b)(2)(A)(i), (ii), (iii) are mutually exclusive; that is, that a plan proponent can only choose one of the alternatives with regard to each secured creditor in its plan. This Court sees no reason why any or all three alternatives could not be used with regard to the same secured claim depending upon the particular circumstances involved. For example, if a secured creditor held a lien on ten lots in a subdivision, it is possible that plan would be fair and equitable to that creditor if it provided for the sale of three lots with the proceeds being applied to the secured claim, the return of four lots with the value thereof being applied to the secured claim, and the retention of three lots with the remaining secured claim being paid over time such that the present value of the income stream equaled the value of the secured creditor's interest in the remaining lots.
>
>   Here, two of the alternative provisions have been used. First, § 1129(b)(2)(A)(iii) is utilized in order to return the 131 acres . . . for a corresponding credit on the secured claim. Second, § 1129(b)(2)(A)(i) is used with regard to the property being retained. This is not a per se violation of the fair and equitable rule as embodied in § 1129(b)(2) of the Bankruptcy Code.

*Id.* at 946-47. *See also In re Couture Hotel Corp.,* 536 B.R. 712, 742 (Bankr. N.D. Tex. 2015) (citing *In re Simons); In re Bryant,* 439 B.R. 724, 747 (Bankr. E.D. Ark. 2010) ("[T]here is no prohibition on a debtor using several methods to provide a secured creditor with the indubitable equivalent of its claim. Courts have routinely allowed combinations of cash payments, payments over time, abandonment of collateral, and substitution of collateral.").

In *Sandy Ridge*, the Fifth Circuit Court of Appeals discussed the indubitable equivalence requirement under § 1129(b)(2)(A). The plan provided that a tract of land known as "Brightside" would be transferred to the creditor, LNB, for "a credit on the indebtedness *to the extent of* the fair market value." 881 F.2d at 1348. If the debt was not satisfied, Sandy Ridge would transfer up to

$100,000 from a separate tract of land to make up for any shortfall. *Id.* at 1348-49. Other property would be sold and distributed to unsecured creditors. *Id.* at 1349. The court stated:

> Since the value of LNB's secured claim is equal to the value of Brightside, a plan which provides that LNB will realize the indubitable equivalent of Brightside will satisfy the requirements of section 1129(b)(2)(A)(iii). The current plan provides that LNB will receive Brightside itself, and since common sense tells us that property is the indubitable equivalent of itself, this portion of the current plan satisfies the "indubitable equivalent" requirement.

*Id.* at 1350. The Court further noted that "LNB will receive the actual property underlying its secured claim and, therefore, it is clear that it will receive the indubitable equivalent of its secured claim." *Id.* Nothing in *Sandy Ridge* prohibits the transfer of part of a secured creditor's collateral in satisfaction of part of a secured claim.

Courts since *Sandy Ridge* have recognized the validity of partial "dirt-for-debt" plans. A bankruptcy court in Texas approved a plan that returned part of the secured creditor's collateral for a credit and paid the balance of the secured claim over time with interest. *See In DLH Master Land Holding, LLC*, No. 10-30561-HDH-11, 2011 WL 5883881 (Bankr. M.D. Tex. Nov. 23, 2011). Compass Bank was the holder of a $19.5 million claim secured by 1350 acres across numerous parcels. The plan proposed to transfer nine parcels containing 150 acres to Compass on the effective date, reducing the claim by $5.3 million. *Id.* at *6. Compass would receive a note secured by liens on the remainder of the property and deferred cash payments, with interest, due in five years. Compass would also receive a release price upon the sale of any of the property. *Id.* The court held that the plan complied with §1129(b)(2)(A)(i) because the note would be secured by the first lien on all collateral, except parcels to be conveyed to Compass in partial payment. *Id.* at *7. The court further held that the "remaining tracts of land, after the dirt for debt conveyance, and the note secured by the land provide Compass with the indubitable equivalent of its claim." *Id.* at *8. The court found that "the value of the dirt for debt [p]arcels to be transferred to Compass

plus the new Compass Note at the Court-determined rate of 7.25% to be received by Compass will fully compensate Compass so that it is receiving the indubitable equivalent of its rights." *Id.* Therefore, the Plan did not "unfairly discriminate against Compass, and . . . the treatment of Compass's Allowed Secured Claim is fair and equitable." *Id.* at 9. *See Metropolitan Life Ins. Co. v. San Felipe @ Voss, Ltd. (In re San Felipe @ Voss, Ltd.)* 115 B.R. 526 (S.D. Tex. 1990) (payment package including cash, stock, and guaranties constituted indubitable equivalent of allowed secured claim within § 1129(b)(2)(A)(iii))*; In re Simons,* 113 B.R. at 946-47; *see also B.M. Brite v. Sun Country Dev. (In re Sun Country Dev.),* 764 F.2d 406, 409 (5th Cir. 1985) (21 notes from 21 obligors secured by 21 lots was indubitable equivalent of first lien on 200 acres).

A plan may propose a "partial dirt-for-debt" surrender of a portion of collateral, but "[i]n such cases, courts must make findings on the value of the real estate to determine whether a partial dirt-for-debt plan meets the indubitable equivalence requirement." *CRB Partners, LLC,* No. 11-11924-CAG, 2013 WL 796566, at *5 (Bankr. W.D. Tex. 2013). This Court has made its findings on the Plan valuation of the trucks, and the Debtors have met their burden to show the indubitable equivalence of the property to be returned.

Section 1129(b)(2)(A) is applicable with respect to "a class of secured claims." The Plan provides the same treatment of each holder of a Class 3 Secured Truck Claim (Operable Trucks) by providing lien retention and repayment of replacement value in deferred payments over 48 months with interest. This type of cash payment is allowable under the statutory requirements of § 1129(b)(2)(A)(i).

Each holder of Class 4 Secured Truck Claims (Inoperable Trucks)[8] is provided the same treatment of electing either collateral return or a sale of collateral. "Property is the indubitable

---

[8] The designation of trucks as inoperable does not necessarily mean that the trucks are not repairable and could become operable.

equivalent of itself." *Sandy Ridge,* 881 F.2d at 1350. Therefore, this type of collateral return provision is allowable under § 1129(b)(2)(A)(iii).

PACCAR objects to the division of its secured claim into two different classes. Even if the secured truck claims were included in one class,[9] applicable authorities allow treatment that includes both return of collateral and deferred payments. Secured Creditors in Classes 3 and 4 will receive both actual property as the indubitable equivalent of their claims and deferred payments on collateral that is not returned at the replacement valuation with interest while retaining their liens.

Based on legislative history and applicable case law, this Court finds that the alternative treatments delineated in § 1129(a)(2)(A) are neither mutually exclusive nor exhaustive. In the absence of specific statutory authority prohibiting the Plan's treatment of secured truck claims, the Court finds that the treatment of these claims does not unfairly discriminate and is fair and equitable under the Plan as required by §§ 1129(b)(1) and (b)(2). The objections to the treatment of secured truck claims are overruled.

## ORDER

Because the Plan as modified by the Plan Supplement does not discriminate unfairly and is fair and equitable as defined under 11 U.S.C. § 1129(b) with respect to each impaired rejecting class, confirmation is required.

**IT IS THEREFORE ORDERED** that all objections are **OVERRULED** and

**FURTHER ORDERED** that the plan proponents submit a proposed Order of Confirmation.

*## END OF ORDER##*

---

[9] The classification of Class 3 and Class 4 separately is a logical separation of similar secured claims for trucks to be retained and those to be returned. *See* 11 U.S.C. §§ 1122, 1123.